UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


|                              |   |                        |
|------------------------------|---|------------------------|
|                              | ) |                        |
| UNITED STATES OF AMERICA,    | ) |                        |
|                              | ) |                        |
|          Plaintiff,          | ) |                        |
|                              | ) | Criminal Action        |
| v.                           | ) | No. 14-CR-10243-MLW    |
|                              | ) |                        |
| GABRIEL BITRAN,              | ) |                        |
| MARCO BITRAN,                | ) |                        |
|                              | ) |                        |
|          Defendants.         | ) |                        |
|                              | ) |                        |


BEFORE THE HONORABLE MARK L. WOLF, DISTRICT JUDGE


HEARING


December 10, 2014
1:16 p.m.


John J. Moakley United States Courthouse
Courtroom No. 10
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

1   APPEARANCES:

2   On Behalf of the Government:
    UNITED STATES ATTORNEY'S OFFICE
3        By:  AUSA Sara M. Bloom
                AUSA Brian Perez-Daple
4        One Courthouse Way, Suite 9200
         Boston, Massachusetts 02210
5        (617) 748.3265
         sara.bloom.@usdoj.gov

6

7   On Behalf of the Defendant Gabriel Bitran:
    FOLEY HOAG LLP
8        By:  Nicholas C. Theodorou, Esq.
                Dana McSherry, Esq.
9        155 Seaport Boulevard
         Seaport World Trade Center West
10       Boston, Massachusetts 02210
         617-832-1163
11       ntheodorou@foleyhoag.com

12

13  On Behalf of the Defendant Marco Bitran:
    MCDERMOTT WILL & EMERY
         By:  Mark W. Pearlstein, Esq.
14              Michele L. Adelman, Esq.
         28 State Street
15       Boston, Massachusetts 02109
         617-535-4000
16       mpearlstein@mwe.com

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2            (Deputy Clerk Hohler called the case to order.)
 3            THE COURT:  Good afternoon.  Would counsel please
 4    identify themselves for the Court and for the record.
 5            MS. BLOOM:  Good afternoon, Your Honor.  Sara Bloom
 6    and Brian Perez-Daple for the United States.
 7            MR. PEARLSTEIN:  Good afternoon.  Mark Perlstein and
 8    Dana McSherry on behalf of the defendant, Marco Bitran.
 9            MR. THEODOROU:  Good afternoon, Your Honor.  Nicholas
10    Theodorou and Michele Adelman on behalf of the defendant,
11    Gabriel Bitran.
12            THE COURT:  Okay.  As I understand it, each of the
13    defendants would like to waive indictment and plead guilty to
14    the one conspiracy count against him pursuant to a binding
15    11(c)(1)(C) plea agreement.  Is that right?
16            MR. THEODOROU:  That's correct, Your Honor.
17            MR. PEREZ-DAPLE:  That's correct.
18            MR. PEARLSTEIN:  Correct.
19            THE COURT:  And as I read it, the plea agreements
20    appear to be the same.  Each requires that I impose a sentence
21    of 24 to 60 months in prison, no fine, although you'll need to
22    tell me the maximum -- no fine, restitution, although an amount
23    I think is not specified, and I'll need to advise of an amount.
24    And then I'd like the paragraph 10 forfeiture provision
25    explained to me.
```

01:16 (line 10)
01:16 (line 20)

 1              But am I correct so far as to the terms of the

 2     agreed-upon sentence?

 3              MS. BLOOM:  Yes, Your Honor.

 4              MR. THEODOROU:  Yes, Your Honor.

 5              MS. PEARLSTEIN:  Yes, Your Honor.

 6              THE COURT:  And what is the maximum forfeiture,

 7     Ms. Bloom?

 8              MS. BLOOM:  Your Honor --

 9              THE COURT:  I'm sorry.  Maximum restitution.

01:17 10         MS. BLOOM:  The government submits that the loss is

 11    approximately $140 million.  So the maximum restitution would

 12    be that loss amount.  However, there is a proposed resolution

 13    as to how that restitution should be satisfied in the plea

 14    agreement.

 15              THE COURT:  Okay.

 16              MS. PEARLSTEIN:  Your Honor, if I may, it won't

 17    surprise you to know that the defendants have a very different

 18    view on loss, but I agree with Ms. Bloom, that we believe what

 19    we've negotiated is going to both be legally right and --

01:18 20         THE COURT:  Well, for today's purposes, as you know, I

 21    have to advise each defendant of the maximum possible

 22    restitution, so I just need the upper limit.  And if it's

 23    material to calculate the guidelines, I will, at sentencing,

 24    determine the amount of the loss.

 25              MS. PEARLSTEIN:  It will not be material because under

1    either parties' calculation, the guideline range exceeds the

2    statutory maximum.

3            THE COURT:  I see.  And the forfeiture, could you

4    explain to me how the forfeiture provisions are intended to

5    work?

6            MS. BLOOM:  Yes, Your Honor.  The forfeiture

7    provisions essentially provide for the forfeiture of the assets

8    which have been marshalled to begin to satisfy restitution.

9    There's also a provision for payment over time.  But those

01:19 10   assets will be not only agreed to be paid to restitution but be

11   forfeited, which will facilitate both receiving in the monies

12   that have already been paid to the SEC and putting everything

13   together in one place.

14           We anticipate and have already initially requested

15   permission for those forfeited assets to then be applied to the

16   restitution.

17           THE COURT:  And the agreed disposition, I think I

18   didn't say this, part of the restitution calls for a payment of

19   10 percent of each defendant's adjusted gross income as

01:20 20   reported on his federal tax return to the enforceable term of

21   the judgment.  How long is that?

22           MS. BLOOM:  My understanding is that it runs 20 years

23   from release from prison.

24           THE COURT:  All right.  Well, since this is a binding

25   plea agreement, I will decide whether to accept the waiver of

indictment.  I will ask the questions necessary to decide

whether to accept the plea, but I'll defer until sentencing the

decision as to whether to accept the plea agreement.  And if I

don't accept the plea agreement at the time of the sentencing

hearing, the defendants or defendant will be offered an

opportunity to withdraw his plea.

          Is the two to five years a downward departure or

variance?

          MS. BLOOM:  It is well below the guideline range.

01:21     THE COURT:  Then when you prepare your sentencing

memos and arguments, you'll have to explain why it meets the

requirements of Section 6B1.2(c)(2) of the guidelines which

require justifiable reasons for a downward departure or

variance.

          All right.  Now I'd like each of the defendants to

stand and be sworn.  And they can stay there.  I'll ask the

questions once.  They should each answer for themselves.

          MR. THEODOROU:  Your Honor, with Professor Bitran, in

his case, may he affirm?

01:21     THE COURT:  Yes.

          MR. THEODOROU:  Thank you.  Yes.  Swear or affirm.

          (Whereupon Gabriel Bitran was duly affirmed and Marco

Bitran was duly sworn.)

          THE COURT:  Now I'm going to ask you these questions

once.  You should each answer for yourself.  And on some of

1    them I'll follow up with you individually, but I'd say Gabriel

2    should answer first and Marco second.

3           Would you please state your true full name.  And you

4    can remain seated.

5           GABRIEL BITRAN:  Gabriel Richard Bitran.

6           MARCO BITRAN:  Marco Bitran.

7           THE COURT:  Do you understand that you've just taken

8    an oath to answer the questions I'm going to ask you

9    truthfully, and any failure to do that could be a separate

01:22 10    prosecutable criminal offense?

11           GABRIEL BITRAN:  Yes, I do, Your Honor.

12           MARCO BITRAN:  Yes, I do.

13           THE COURT:  Do you also understand that if you're

14    confused by any of my questions or unsure about what an honest

15    and accurate answer would be, I'll let you speak to your

16    attorney so we can clear up any confusion, and you can give me

17    a reliable response?

18           GABRIEL BITRAN:  Yes, Your Honor, I understand.

19           MARCO BITRAN:  Yes, Your Honor.

01:22 20    THE COURT:  Have you ever been arrested or convicted

21    under any name other than the name you just gave me?

22           GABRIEL BITRAN:  No.

23           MARCO BITRAN:  No, Your Honor.

24           THE COURT:  How old are you?

25           GABRIEL BITRAN:  I am 69 and a half.

1          MARCO BITRAN:  39.

2          THE COURT:  Where were you born?

3          GABRIEL BITRAN:  I was born in Port Said, Egypt.

4          MARCO BITRAN:  I was born in Brazil.

5          THE COURT:  Are you a United States citizen?

6          GABRIEL BITRAN:  Yes.

7          MARCO BITRAN:  Yes.

8          THE COURT:  How far did you go in school?

9          GABRIEL BITRAN:  I got a doctorate degree.

01:23 10          MARCO BITRAN:  Masters degree.

11          THE COURT:  And have you ever been treated for mental

12    illness or drug addiction?

13          GABRIEL BITRAN:  No, but I just want to make sure that

14    I -- I have been taking medication for depression for a long

15    time.

16          THE COURT:  Okay.  And I'll ask your son.  Have you

17    ever been treated for mental illness or drug addiction?

18          GABRIEL BITRAN:  No.  I've just been taking

19    antianxiety medication since the Justice Department process has

01:24 20    been going.

21          THE COURT:  All right.  I'll ask each of you again,

22    starting with Gabriel Bitran, what do you understand is

23    happening here today?

24          GABRIEL BITRAN:  Well, I understand -- would you like

25    me to stand up?  I understand that we are recognizing that we

1   have committed some fraud conspiracy, for which we accept.  We

2   have agreed -- we read the document that Mrs. Bloom wrote, and

3   we accept that.

4           THE COURT:  Okay.  So do you understand that you're

5   giving up -- which I'll explain to you -- certain rights and

6   are seeking to plead guilty to essentially a fraud charge

7   against you?

8           GABRIEL BITRAN:  I apologize, Your Honor.  Could you

9   repeat, please, what you said?

01:25 10           THE COURT:  Yes.  Do you understand that we're here

11  today because I'm told you would like to give up certain rights

12  that I'm going to explain to you, and you would like to plead

13  guilty to what is essentially a conspiracy to commit fraud

14  against you?

15          GABRIEL BITRAN:  That's correct, Your Honor, I

16  understand that.

17          MARCO BITRAN:  Yes, Your Honor.

18          THE COURT:  And do the medications -- well, are you

19  now under the influence of any drug, medication or alcohol,

01:25 20  except the medication for depression or anxiety that you

21  mentioned earlier?

22          GABRIEL BITRAN:  No, Your Honor.

23          MARCO BITRAN:  No, Your Honor.

24          THE COURT:  Have you been given a copy of the

25  information with the charge against each of you in this case?

1           GABRIEL BITRAN:  Yes, Your Honor.

2           MARCO BITRAN:  Yes, Your Honor.

3           THE COURT:  Did you read it?

4           MARCO BITRAN:  Yes, Your Honor.

5           GABRIEL BITRAN:  Yes, Your Honor.

6           THE COURT:  Did you discuss it with your attorneys,

7    including what the government would have to prove beyond a

8    reasonable doubt to prove that charge if we had a trial?

9           MARCO BITRAN:  Yes, Your Honor.

01:26 10          GABRIEL BITRAN:  Yes, Your Honor.

11          THE COURT:  And are you fully satisfied with your

12   lawyers' work on your behalf?

13          GABRIEL BITRAN:  Yes, Your Honor.

14          MARCO BITRAN:  Yes, Your Honor.

15          THE COURT:  Do you understand the charge against you

16   is what's called a federal felony, meaning a crime punishable

17   by more than one year in prison?

18          GABRIEL BITRAN:  We understand that that's the case,

19   Your Honor.

01:26 20          MARCO BITRAN:  Yes, Your Honor.

21          THE COURT:  And do you understand that under the

22   United States Constitution, when a federal felony is involved,

23   you have a right to be charged in an indictment issued by a

24   grand jury rather than an information like this one issued by

25   the United States Attorney?

1     GABRIEL BITRAN:  I understand that, Your Honor.

2     MARCO BITRAN:  Yes, Your Honor.

3     THE COURT:  Do you understand that a grand jury is

4  made up of 16 to 23 people, and at least 12 of them would have

5  to find probable cause to believe you committed a particular

6  crime to charge you with that crime?

7     GABRIEL BITRAN:  Yes, Your Honor.

8     MARCO BITRAN:  Yes, Your Honor.

9     THE COURT:  Do you understand that if this matter was

01:27 10  presented to a grand jury, it might or might not bring this

11  charge against you?

12     GABRIEL BITRAN:  Yes, Your Honor.

13     MARCO BITRAN:  Yes, Your Honor.

14     THE COURT:  Could we have the signed plea agreements,

15  please.

16     MS. BLOOM:  I have extra copies.  I believe they've

17  already been filed.

18     THE COURT:  I'll make the August 5 letter to

19  Mr. Theodorou concerning Gabriel Bitran Exhibit 1 and the

01:28 20  letter of the same date to Mr. Pearlstein regarding Marco

21  Bitran Exhibit 2.

22     Do you each have a copy of the letter to your attorney

23  in front of you?

24     MARCO BITRAN:  Yes, Your Honor.

25     GABRIEL BITRAN:  Yes, Your Honor.

1          THE COURT:  Is that your plea agreement with the

2     government?

3          GABRIEL BITRAN:  Yes, Your Honor.

4          MARCO BITRAN:  Yes, Your Honor.

5          THE COURT:  Did you sign that agreement?

6          GABRIEL BITRAN:  Yes, Your Honor.

7          MARCO BITRAN:  Yes, Your Honor.

8          THE COURT:  Did you read it before you signed it?

9          GABRIEL BITRAN:  Yes, Your Honor.

01:28 10          MARCO BITRAN:  Yes.

11          THE COURT:  And did you discuss it with your lawyer

12     before you signed it?

13          MARCO BITRAN:  Yes, yes, Your Honor.

14          GABRIEL BITRAN:  Yes, Your Honor.

15          THE COURT:  Did you feel you understood the letter

16     before you signed it?

17          GABRIEL BITRAN:  Yes, Your Honor.

18          MARCO BITRAN:  Yeah.

19          THE COURT:  Does that letter both accurately and

01:29 20     completely describe your agreement with the government?

21          GABRIEL BITRAN:  It does -- it does, yes.

22          MARCO BITRAN:  Yes, Your Honor.

23          THE COURT:  Has anybody made any promises to you or

24     given you any assurances that are not in the letter to your

25     lawyer?

1         GABRIEL BITRAN:  No, Your Honor.

2         MARCO BITRAN:  No, Your Honor.

3         THE COURT:  Has anybody threatened you or tried to

4    force you to waive the indictment and plead guilty?

5         MARCO BITRAN:  No, Your Honor.

6         GABRIEL BITRAN:  No, Your Honor.

7         THE COURT:  Do you understand that in this letter,

8    you're giving up your right to have this matter presented to a

9    grand jury and you're agreeing to have this case proceed based

01:29 10   on this information issued by the United States Attorney's

11   Office as if you had been indicted?

12        GABRIEL BITRAN:  Yes, Your Honor.

13        MARCO BITRAN:  Yes, Your Honor.

14        THE COURT:  And do you wish to do that?

15        GABRIEL BITRAN:  Yes, Your Honor.

16        MARCO BITRAN:  Yes, Your Honor.

17        THE COURT:  Do you understand that in your respective

18   letters, in paragraph 8, you're giving up certain rights to

19   appeal or otherwise challenge matters in this case?

01:30 20        GABRIEL BITRAN:  Yes, Your Honor.

21        MARCO BITRAN:  Yes, Your Honor.

22        THE COURT:  And particularly, you're giving up your

23   right in the future to appeal or challenge whether you're

24   guilty and also giving up your right to appeal or challenge my

25   sentence if I give you a sentence, as agreed upon, between two

```
 1  years and up to five years?
 2          GABRIEL BITRAN:  Yes, Your Honor.
 3          MARCO BITRAN:  Yes, Your Honor.
 4          THE COURT:  And have you discussed specifically with
 5  your respective lawyers whether you want to give up those
 6  rights to appeal and challenge?
 7          GABRIEL BITRAN:  Yes, Your Honor.
 8          MARCO BITRAN:  Yes, Your Honor.
 9          THE COURT:  And do you wish to do that?
10          GABRIEL BITRAN:  Yes, Your Honor.
11          MARCO BITRAN:  Yes, Your Honor.
12          THE COURT:  All right.  Well, I'm satisfied that
13  you're each competent, you're acting knowingly and voluntarily,
14  and you are effectively represented, so I will accept your
15  waivers of indictment.
16          Does somebody have a waiver of indictment form?
17          MS. BLOOM:  Yes, Your Honor.  I believe each defendant
18  has it in front of them.
19          MR. THEODOROU:  Your Honor?
20          THE COURT:  Yes.
21          MR. THEODOROU:  Just to clarify, it doesn't affect
22  anything on his memory or anything, but he also gets treated --
23  it's in the pretrial report -- for cholesterol.
24          THE COURT:  Okay.  Thank you.
25          I signed the waiver of indictment form.  We can move
```

01:30 (line 10)
01:32 (line 20)

1    to the arraignment phase of these proceedings.

2         Does each defendant want the information read to him,

3    or will he waive the reading of the information, meaning give

4    it up?

5         MARCO BITRAN:  Certainly waive.

6         GABRIEL BITRAN:  We can waive.

7         THE COURT:  How do you now wish to plead to the charge

8    against you; guilty or not guilty?

9         MARCO BITRAN:  Guilty, Your Honor.

01:33 10        GABRIEL BITRAN:  Guilty.

11        THE COURT:  I'm going to ask you some additional

12   questions to determine whether I should accept your guilty

13   pleas.

14        Do you understand, if I accept your plea of guilty,

15   you may lose certain rights if you have them, including the

16   right to vote, the right to hold public office and the right to

17   possess a firearm?

18        GABRIEL BITRAN:  I do understand that.

19        MARCO BITRAN:  Yes, Your Honor.

01:33 20        THE COURT:  And do you understand that you may also

21   lose the right to serve on a jury?

22        MARCO BITRAN:  Yes.

23        GABRIEL BITRAN:  Yes, Your Honor.

24        THE COURT:  Do you understand that the maximum

25   possible penalties are, as stated in paragraph 2 of your

respective plea agreements, particularly, up to five years in prison; supervised release of up to three years; a fine of up to $250,000 or twice the gross gain or loss, whichever is greater; mandatory special assessment of $100; restitution in the amount of $140 million and forfeiture to the extent charged in the information?

GABRIEL BITRAN:  Yes, Your Honor.

MARCO BITRAN:  Yes, Your Honor.

THE COURT:  Do you understand that supervised release means that if you're sentenced to prison, when you're released, you'll be under the supervision of the probation department on certain conditions; and if you violate any of those conditions, you can be locked up again for up to the full term of the supervised release?

GABRIEL BITRAN:  Yes, Your Honor.

MARCO BITRAN:  Yes, Your Honor.

THE COURT:  Do you understand that the sentencing in this case will be governed by the advisory guideline system now in effect in Federal Courts?

GABRIEL BITRAN:  Yes, Your Honor.

MARCO BITRAN:  Yes, Your Honor.

THE COURT:  Have you talked with your respective lawyers about how that guideline system might operate in your case?

GABRIEL BITRAN:  Yes, Your Honor.

1          MARCO BITRAN:  Yes, Your Honor.

2          THE COURT:  Do you understand, however, as we sit here

3    today, neither your lawyer, nor anybody else, can tell you with

4    certainty what the guideline range is for your sentence or

5    whether I will accept the agreed-upon sentence?

6          GABRIEL BITRAN:  I understand, Your Honor.

7          MARCO BITRAN:  Yes, Your Honor.

8          THE COURT:  Do you understand that if I reject the

9    agreed-upon sentence, two to five years in prison for each of

01:35 10   you, you will -- let me say it again -- if I do not accept the

11   sentence to which you've agreed in the plea agreement, I will

12   offer you an opportunity to withdraw your plea and go to trial?

13         GABRIEL BITRAN:  Yes, Your Honor.

14         MARCO BITRAN:  Yes, yes, Your Honor.

15         THE COURT:  But do you understand that if I give you a

16   sentence at the high or highest end of that range, five years,

17   but any sentence that's higher than you hoped for or even

18   higher than the government recommends within the range, that

19   will not be a reason permitting you to withdraw your guilty

01:36 20   plea?  Do you understand that?

21         GABRIEL BITRAN:  I'm sorry.  I'm not sure.

22         THE COURT:  Let me say it again.  Do you understand

23   you've each agreed that I should impose a sentence of at least

24   two years and up to five years?

25         GABRIEL BITRAN:  Yes, sir.

1          MARCO BITRAN:  Yes, Your Honor.

2          THE COURT:  Do you understand that if I impose a

3     sentence within that range that's higher than you hoped for or

4     even higher than the government recommends, that won't be a

5     reason permitting you to withdraw your plea?

6          GABRIEL BITRAN:  Yes, sir.

7          MARCO BITRAN:  Yes, Your Honor.

8          THE COURT:  Do you understand that you still have a

9     right, if you want to use it, to have the charge against you

01:36 10   decided at a trial by a jury?

11          MR. THEODOROU:  Your Honor, could you repeat it?

12          THE COURT:  Yes.

13          Do you understand that you still have a right, if you

14     want to use it, to have the charge against you decided at a

15     trial by a jury.

16          You can talk to Mr. Theodorou.

17          (Defendant confers with counsel.)

18          GABRIEL BITRAN:  Yes, Your Honor.

19          MARCO BITRAN:  Yes, Your Honor.

01:37 20   THE COURT:  And do you understand, if we had a trial,

21     you would have a right to a lawyer; and if you couldn't afford

22     a lawyer, one would be appointed to represent you at public

23     expense?

24          GABRIEL BITRAN:  Yes, Your Honor.

25          MARCO BITRAN:  Yes.

1        THE COURT:  Do you understand, if we had a trial, you

2   would be presumed innocent?  You would not have to prove you

3   were innocent; rather the government would have to prove you

4   were guilty beyond a reasonable doubt to achieve your

5   conviction?

6        GABRIEL BITRAN:  Yes, Your Honor.

7        MARCO BITRAN:  Yes, Your Honor.  Just to say, I very

8   much want to plead guilty and accept responsibility for what

9   happened.

01:37 10        THE COURT:  Okay.  I just have to make sure that you

11   know what rights you're giving up, so that's why I have to ask

12   you these questions.

13        MARCO BITRAN:  Understood.

14        THE COURT:  Do you understand, if we had a trial, you

15   would have an opportunity, through your lawyer, to object to

16   the government's evidence and challenge its witnesses?

17        MARCO BITRAN:  Yes, Your Honor.

18        GABRIEL BITRAN:  Yes, Your Honor.

19        THE COURT:  Do you understand, if we had a trial,

01:38 20   you'd have an opportunity but not an obligation to present a

21   defense?

22        MARCO BITRAN:  Yes, Your Honor.

23        GABRIEL BITRAN:  Yes, Your Honor.

24        THE COURT:  And do you understand, if we had a trial,

25   you would have an opportunity but not an obligation to testify;

1    and if you decided not to testify, I would instruct the jury

2    that it could draw no suggestion that you were guilty from your

3    decision not to testify?

4         GABRIEL BITRAN:  Yes, Your Honor.

5         MARCO BITRAN:  Yes, Your Honor.

6         THE COURT:  And do you understand that if I accept

7    your guilty plea, you'll be giving up your right to a trial and

8    there will be no trial?

9         GABRIEL BITRAN:  Yes, Your Honor.

01:38 10        MARCO BITRAN:  Yes, Your Honor.

11        THE COURT:  Do you understand that in this case,

12   you're charged each with engaging in the crime of conspiracy

13   that had four alleged goals?  Do you understand that's the

14   charge against you?

15        In fact, it's set out on pages 6 and 7.  Actually, it

16   perhaps had three goals.

17        GABRIEL BITRAN:  Yes, Your Honor, I do agree.

18        MARCO BITRAN:  Yes, Your Honor.

19        THE COURT:  And now I'm going to tell you what the

01:39 20  government would have to prove to prove that charge against

21   you.

22        Do you understand that a conspiracy is an agreement to

23   commit a crime?  It's the agreement that is the crime and, to

24   prove the charge of conspiracy against you, the government

25   would have to prove three things beyond a reasonable doubt:

1   First, that the agreement alleged in the indictment and not

2   some other agreement existed between at least two people;

3   second, that you willingly, meaning knowingly, not by accident

4   or mistake, and understanding it was unlawful, joined that

5   agreement; and third, that one of the conspirators committed

6   some act to try to achieve a goal of the conspiracy?

7          Do you understand that?

8          GABRIEL BITRAN:  Yes, Your Honor.

9          MARCO BITRAN:  Yes, Your Honor.

01:40 10          THE COURT:  And do you understand that there are three

11   alleged goals of the conspiracy here, and the government would

12   have to prove the conspiracy existed and it had at least one of

13   these goals beyond a reasonable doubt?  Do you understand that?

14          GABRIEL BITRAN:  Yes, Your Honor.

15          MARCO BITRAN:  Yes, Your Honor.

16          THE COURT:  Do you understand the first alleged goal

17   of the conspiracy is that it was to commit securities fraud?

18   And generally, to prove securities fraud, the government has to

19   prove that a defendant used a scheme to defraud someone, or

01:41 20   made an untrue statement of material fact, a fact that could

21   affect the decisionmaker, or failed to disclose a material fact

22   in a way that made the defendants' statements misleading or

23   otherwise engaged in an act or practice that would operate as a

24   fraud upon any person; second, that the acts were in connection

25   with the purchase or sale of specified securities; and third,

1    that the defendant directly or indirectly used the mail or wire

2    transmissions between states; and fourth, that the defendant

3    acted for the purpose of defrauding buyers or sellers of

4    specified securities?

5              GABRIEL BITRAN:  I understand that those are the --

6    yes.

7              MARCO BITRAN:  Yes, Your Honor.

8              THE COURT:  Do you understand that a second alleged

9    objective of the conspiracy is to commit wire fraud?  And to

01:42 10   prove wire fraud generally, the government would have to prove

11   beyond a reasonable doubt first that there was a scheme

12   substantially as charged in the indictment to defraud or obtain

13   money by means of false or fraudulent pretenses; second, that

14   the scheme to defraud involved the misrepresentation or

15   concealment of a material fact or was to obtain money by the

16   use of false or fraudulent pretenses; third, that a defendant

17   acted knowingly, meaning intentionally, not by accident or

18   mistake, and willfully, knowing it was unlawful to participate

19   in the scheme with intent to defraud, to cheat people, someone,

01:43 20   out of money; and fourth, for the purpose of executing the

21   scheme or in furtherance of the scheme, a defendant caused an

22   interstate wire communication to be used or is reasonably

23   foreseeable that for the purpose of executing the scheme, an

24   interstate wire communication would be used, on or about the

25   date alleged?

1          GABRIEL BITRAN:  I understand, Your Honor.

2          MARCO BITRAN:  Yes, Your Honor.

3          THE COURT:  And the third alleged goal, alternative

4    goal that would have to be proven beyond a reasonable doubt, is

5    destroying, altering or falsifying a document in a federal

6    investigation, which requires proof beyond a reasonable doubt

7    that, one, the defendant knowingly falsified a document; two,

8    the defendant did so with intent to impede, obstruct or

9    influence an investigation or the proper administration of a

01:44 10   matter; and three, the investigation or matter was within the

11   jurisdiction in this case of the Securities and Exchange

12   Commission, a department of the United States government; do

13   you understand that?

14          GABRIEL BITRAN:  Yes, Your Honor.

15          MARCO BITRAN:  Yes, Your Honor.

16          THE COURT:  And the particular charge against you is

17   in paragraph 29 that begins on page 6.  It says that from in or

18   about April 2005 and until in or about 2011, in the District of

19   Massachusetts and elsewhere, Gabriel Bitran and Marco Bitran,

01:44 20   together with others known and unknown to the United States,

21   conspired to commit the following offenses against the United

22   States:

23          Securities fraud, by willfully, by the use of means

24   and instrumentalities of interstate commerce and the mails,

25   directly and indirectly to use and employ manipulative and

1    deceptive devices and contrivances in connection with the

2    purchase or sale of a security in contravention of Rule 10b-5

3    in the regulations promulgated by the SEC by, A, employing

4    schemes to defraud; B, making untrue statements of material

5    facts and omitting to state material facts necessary in order

6    to make the statements made, in light of the circumstances

7    under which they were made, not misleading; and C, engaging in

8    acts, practices and courses of business which would and did

9    operate as a fraud and deceit, in connection with the purchase

01:45 10   and sale of securities.

11             Do you understand that that's the conspiracy charge

12   and statement of one of the alleged goals of the conspiracy?

13             GABRIEL BITRAN:  I do, Your Honor.

14             MARCO BITRAN:  Yes, Your Honor.

15             THE COURT:  And then it's also alleged that the

16   conspiracy had a second goal, wire fraud, as I've just defined

17   it for you.  It's alleged that you or a co-conspirator devised

18   a scheme to defraud and obtain, or obtain, money and property

19   by means of materially false or fraudulent representations and

01:46 20   to transmit and cause to be transmitted in interstate

21   commerce -- that means from one state to another -- wire

22   communications for the purpose of executing the scheme to

23   defraud.

24             Do you understand that's the second alleged goal of

25   the conspiracy that the government could prove beyond a

1    reasonable doubt -- would have to prove beyond a reasonable

2    doubt --

3              GABRIEL BITRAN:  Yes, Your Honor.

4              MARCO BITRAN:  Yes, Your Honor.

5              THE COURT:  -- if it was going to rely on that as an

6    alleged goal of the conspiracy?

7              And third, it's charged that the third goal of the

8    conspiracy was falsification of records in a matter within the

9    jurisdiction of the Securities and Exchange Commission, a

01:47 10   department and agency of the executive branch of the United

11   States government to knowingly conceal, cover up, falsify and

12   make false entries in records, documents and tangible objects

13   with the intent to impede, obstruct or influence the

14   investigation or proper administration of a matter within the

15   jurisdiction of the SEC and in relation to, in contemplation of

16   such matter and case.

17             Do you understand that?

18             GABRIEL BITRAN:  Yes, Your Honor.

19             MARCO BITRAN:  Yes, Your Honor.

01:47 20   THE COURT:  How do you now wish to plead to this

21   charge against you in Count One; guilty or not guilty?

22             GABRIEL BITRAN:  Plead guilty, Your Honor.

23             MARCO BITRAN:  Guilty, Your Honor.

24             THE COURT:  I'm going to ask you to listen while

25   Ms. Bloom, I assume, summarizes what the government's evidence

1    would have been if we went to trial.  Then I'm going to ask you

2    if you agree with the government's summary of what you did.

3         MS. BLOOM:  Thank you, Your Honor.

4         Had this case gone to trial, the government expects

5    that the evidence would have demonstrated the following:

6         Gabriel Bitran was a professor and former deputy dean

7    at the MIT Sloan School of Management.  His son, Marco Bitran,

8    has a bachelor of science degree from MIT in engineering and an

9    MBA from Harvard.

01:48 10       In about 2005, Gabriel and Marco agreed to launch an

11   investment firm together, which grew into a set of hedge funds

12   under the GMB Management umbrella.  In about August 2007, the

13   Bitrans registered GMB Management as an investment advisor with

14   the United States Securities and Exchange Commission and began

15   performing investment advisor services and management services

16   as well.

17        In about May 2008, the Bitrans created a new entity,

18   GMB Partners, to hold the hedge fund business.  In order to

19   make money from these businesses and services, the Bitrans paid

01:49 20   fees to the GMB businesses and to themselves based on the value

21   of assets under management, and when the funds were profitable,

22   based on the growth of funds as well.  By charging a fee based

23   on assets under management, GMB and the Bitrans made money even

24   if the investors lost money.  In order to gain these fees,

25   Gabriel Bitran and Marco Bitran solicited investors to invest

1   with GMB and to keep their money invested with GMB.

2           Beginning in about the spring of 2005 through 2008,

3   the Bitrans promoted GMB and its hedge fund and advisory

4   services by purporting to have managed their own and investors'

5   money for the last approximately eight years and to have

6   achieved excellent returns using a unique quantitative model

7   and probability engine developed by Gabriel Bitran based upon

8   his MIT research in the area of optimal pricing.

9           MR. THEODOROU:  Could Ms. Bloom slow down a little

01:49 10   bit?

11          MS. BLOOM:  Sure.

12          THE COURT:  In fact, why don't you go back there to

13   the podium so we can maximize the ability of the defendants to

14   hear you.

15          MS. BLOOM:  Thank you, Your Honor.  Specifically,

16   the --

17          THE COURT:  Hold on just one second.  Does any of that

18   need to be repeated?

19          MARCO BITRAN:  No, no.

01:50 20          THE COURT:  Go ahead.

21          MS. BLOOM:  Specifically, the Bitrans told prospective

22   investors that they had used Gabriel Bitran's model to

23   mathematically predict the probability of certain investments'

24   success in order to select investments for friends and family

25   accounts over the previous eight years and that such

investments had returned, on average, more than 16 to 23

percent per year from 1998 to 2005.

The Bitrans provided written support for their claims

as to their track record in the form of tables, which purported

to show the monthly history of the return on investments that

they had achieved.

And from 2005 through about 2008, the Bitrans each

both falsely told potential investors and third-party marketers

that the pre-inception track records for various of the GMB

funds were based on actual trades of exchange traded funds, or

ETFs, in friends and family accounts.  This was not true.

Nonetheless, in the spring of 2005 through about 2008,

the Bitrans distributed GMB marketing materials which falsely

described the purported pre-inception returns as the results of

actual trading with words such as "historic performance,"

"actual performance" in "managed accounts," and "friends and

family managed accounts."

In some GMB funds, such as the Multi-Strat funds and

the Low Volatility funds, the Bitrans also used investors'

money primarily to make investments in instruments whose value

was linked to the value of other independently managed hedge

funds, these so-called funds of funds.  They did this without

disclosing this to most of the investors.

From about 2006 through 2008, the Bitrans made

presentations and distributed materials that included a table

1     of claimed investment returns for the Multi-Strat strategy.

2     This table purported to show results of the Bitrans' trading of

3     friends and family money following their unique proprietary

4     quantitative model.  In fact, however, the numbers reflected

5     the calculation in Excel of a blend of the historical returns

6     of which 82 percent represented the performance of five

7     independent hedge funds, several of which were themselves

8     broad-based funds of funds.  One of these turned out to be a

9     Madoff feeder fund.

01:52 10          In several of these hedge funds, the Bitrans invested

11    the funds they received from investors primarily in these other

12    hedge funds over whose strategies they had no control, rather

13    than according to the Gabriel Bitran unique mathematical model

14    as they had claimed.

15          From about 2009 through April 2011, the Bitrans also

16    continued to pay themselves salaries and fees totaling millions

17    of dollars for purportedly managing assets which they had

18    fraudulently induced investors to invest in or have managed by

19    the GMB entities based on the claim that they were investing

01:52 20    pursuant to Gabriel Bitran's unique mathematical model in safe,

21    exchange-traded funds, when in fact they were primarily

22    investing the funds in other seemingly successful hedge funds.

23          In or about late September 2008, shortly after, Marco

24    Bitran and Gabriel Bitran learned that one of the hedge fund

25    investments upon which the values of the Low Vol and

Multi-Strat funds were based had been exposed to a potential

fraud at the Petters Group Worldwide, the Bitrans liquidated

most of their own family holdings in the Multi-Strat and Low

Vol funds and transferred more than $12 million out of GMB

Partners.

At the same time, the Bitrans concealed from various

GMB investors that certain GMB funds had been impacted by the

reported fraud at the Petters Group and continued to conceal

from investors that several of the GMB funds were extensively

invested in instruments whose values were based on the values

of other hedge funds.

Instead, in October of 2008, the Bitrans sent a letter

to investors, telling those investors that a swap instrument

that the fund had entered into in seeking to realize a higher

return on a portion of its uninvested cash had become illiquid

because one of the parties underlying the swap instrument is

currently experiencing a credit and liquidity crisis in

conjunction with other alleged factors.

In fact, as they well knew, the Multi-Strat and Low

Vol funds faced illiquidity issues and losses in significant

part not because of problems with uninvested cash but because

of the funds' substantial investments in instruments whose

value was linked to at-risk hedge funds.

In or about the fall of 2008, the Bitrans also denied

requests by various investors in funds managed by GMB Partners

to redeem their investments, citing a contractual notice
period, even though the Bitrans had the authority to waive that
notice period and had redeemed their own family investments
without any such notice period.

In or about December 2008, when the Bernard Madoff
fraud was publicly disclosed, the Bitrans also misled investors
about their knowledge that GMB had invested with Madoff and/or
Madoff feeder funds and understated the extent of GMB's
investments and resulting losses associated with the Madoff
funds.

When investors in GMB who had lost significant amounts
of money threatened to sue GMB and the Bitrans, the Bitrans
made false and misleading statements about their fund
strategies and how they had lost the investors' money.  In some
instances, the Bitrans agreed to pay certain investors a small
percentage of their loss investments in return for releases of
claims and an agreement not to report the Bitrans to other
investors or to enforcement authorities.

Between 2006 and 2011, the Bitrans took at least $16
million from their investors' funds as fees for managing these
assets purportedly according to Gabriel Bitran's unique and
proven optimal pricing-driven model.  In total, investors in
GMB lost over $140 million in principal as a result of their
investments in the GMB funds, investments which they had been
induced to make by the Bitrans' fraudulent representations.

1         In addition, as the markets disintegrated, the SEC

2    began investigating, and investors sought answers and the

3    return of their money, the Bitrans also transferred millions of

4    dollars in assets to family investments in an effort to shield

5    the assets from creditors and government enforcement efforts.

6    They also fraudulently used the identity of their own family

7    member in partnership documents in Internal Revenue Service

8    filings and without the family member's permission to conceal

9    the ownership of and the control of the Bitrans' assets by

01:56  10   purporting to shift control of the assets, including proceeds

11   of fraudulent GMB activities, to this family member.

12        First, in late September and early October 2008,

13   Gabriel and Marco Bitran transferred more than $12 million out

14   of GMB to a bank account in the name of a family-owned entity.

15   Some of this money came from the fees the Bitrans had paid to

16   themselves from the fraudulently-induced investments in GMB,

17   and some came from the Bitrans preferential redemption of their

18   own and family investments.  Then the Bitrans transferred these

19   funds through multiple accounts and attempted to conceal the

01:54  20   true ownership and the person in control of the funds.

21        Thus, on January 7, 2009, Marco and Gabriel Bitran

22   transferred at least 8.7 million from the family entity into an

23   account in the name of Marco Bitran.  On February 13, 2009,

24   after the commencement of an SEC exam, Marco Bitran transferred

25   8.7 million from the account in his own name to an account in

the name of another family member.  Then in March 2009, Marco

Bitran asked a friend to serve as a general partner in a

partnership designed to act as a front to hold the assets of

the Bitran family.  When the friend said no, the Bitrans

proceeded to set up such partnership in the name of yet another

family member without the family member's knowledge or

permission.

          To create this front and to disguise ownership and

control the monies withdrawn from GMB, Marco Bitran and Gabriel

Bitran used this close family member's name and identity

without that person's permission to create new entities to hold

their assets.  These new entities included Great Pond

Management the LeCount Hollow and others.  The Bitrans falsely

listed their other family member, without permission, as a

general partner of these new entities.

          To carry out this fraud, on multiple occasions in

2009, Gabriel Bitran persuaded a notary who knew him as a

professor at MIT to falsely notarize a forged signature, that

Gabriel Bitran told the notary was that of a family member, on

partnership agreements and other documents.  Then Marco Bitran

transferred to an account in the name of LeCount Hollow at

least 7.4 million of the funds that he had previously

transferred from GMB to his own account and then to a family

member's account.  From in or about 2009 through about 2010,

the Bitrans transferred additional millions of dollars in

1   proceeds of their fraudulent scheme from GMB into LeCount

2   Hollow.

3         In about 2011, the family member whose name they had

4   used without permission learned of and objected to the

5   unauthorized use.  Then Marco Bitran arranged for another

6   relative to sign documents falsely purporting to designate that

7   new family member as a principal or manager of Great Pond,

8   LeCount Hollow and other entities, including Fisher Property

9   Group and Isalia Property Group, even though this new family

01:59 10   member played no role in managing or operating these entities.

11         In February of 2009, in order to protect assets from

12   potential creditors and potential enforcement actions, Gabriel

13   Bitran and yet another family member created a deed purporting

14   to convey an apartment they owned and rented to others in

15   Brookline to family members other than Gabriel and Marco

16   Bitran.  Gabriel Bitran again caused a false notarization of a

17   forged family member's signature on a deed purporting to

18   transfer the apartment and caused that false and forged

19   signature to be filed with the Registry of Deeds with a false

01:59 20   homestead exemption claim, which claimed that another family

21   member occupied the Brookline apartment when that family member

22   did not.

23         In addition, the Bitrans also made a series of false

24   statements and provided fabricated documents to the SEC in

25   order to conceal fraudulent conduct from the SEC and to impede

the SEC's investigation of their business.  Specifically, on or
about February 9, 2009, in response to the SEC's requests that
GMB Management produce all of GMB Managment client
correspondence, including e-mails, Gabriel Bitran falsely
represented that he did not use e-mail as a primary method of
communication during that time period and did not recall
sending any e-mails and no such e-mails were found during this
period.  In fact, as Gabriel and Marco Bitran knew, Gabriel
Bitran had actually sent and received thousands of e-mails
during the time period in question, including various
communication between Gabriel Bitran and clients of GMB
Management.

        In about the spring and summer of 2009, in response to
the SEC's repeated and specific request for documents to
support GMB's claims of pre-inception investment track records,
Gabriel and Marco Bitran prepared fabricated documents
purporting to reflect histories of trading, including trading
from 1998 through 2005.

        In about the spring and summer of 2009, Gabriel and
Marco Bitran sent the fabricated trading records through their
attorney to the SEC.  Also on July 15, 2009, Marco Bitran, in a
written submission to the SEC, falsely described the fabricated
trading histories as trading logs for the Global Output and
Multi-Strat trading strategies.  In this submission, he also
falsely represented that trading logs presented to the SEC were

1   not fact-tested but in fact were a record reflecting the

2   trading performance of the GMB strategies and personal accounts

3   over time.  Marco Bitran also falsely represented that Gabriel

4   Bitran had, in fact, traded these strategies going back well

5   before 1998.  The trades were recorded in realtime.

6           The evidence would show -- all this evidence and

7   others would show that from April 2005 until in or about 2011,

8   in the District of Massachusetts and elsewhere, Gabriel Bitran

9   and Marco Bitran conspired in violation of 18 U.S.C. Section

02:02 10   371 to commit the following offenses against the United States:

11           Securities fraud, in that they willfully, by means of

12   interstate commerce and in connection with the purchase and

13   sale of a security, carried out a scheme to defraud; wire

14   fraud, in that they used wires traveling interstate commerce,

15   including in Massachusetts, to obtain money or property,

16   including the following specific wires:  wires sent by Marco

17   Bitran on December 6, 2006, January 7, 2008, February 6, 2008,

18   and June 15, 2008 in interstate commerce traveling out of

19   Massachusetts, as set forth more specifically in the

02:02 20   information, and also a wire on April 1, 2008 from Marco Bitran

21   to investors across the country reflecting an interview with

22   Gabriel and Marco Bitran containing false representations; and

23   also that they falsified records, in that they knowingly

24   falsified documents to impede, obstruct and influence the

25   investigation of proper administration of a matter within the

1    jurisdiction of the SEC.

2           And I would also note that there are forfeiture

3    allegations set forth.  Anything further?

4           THE COURT:  Do you agree with the government's

5    description of what you did?

6           GABRIEL BITRAN:  Your Honor, we agree with the facts

7    that are in the document, although we have communicated to

8    Ms. Bloom that we disagree with some of the interpretation of

9    the facts.

02:03 10           THE COURT:  Do you agree with the government's

11   evidence and allegations of what you did?

12           GABRIEL BITRAN:  We -- well, I certainly don't want to

13   give you the impression, Your Honor, that we in any way are

14   trying to get away from the fact that we did commit the fraud

15   that is described.  However, Mrs. Bloom describes many facts

16   substantiating this event of which we have different

17   interpretations.

18           THE COURT:  All right.  But do you agree that you're

19   guilty of the conspiracy charged in Count One?

02:04 20           GABRIEL BITRAN:  Yes, yes, Your Honor.

21           THE COURT:  And I'll ask your son, Marco Bitran.  Do

22   you agree that you're guilty of the conspiracy charged in Count

23   One?

24           MARCO BITRAN:  Yes, Your Honor.

25           THE COURT:  And Ms. Bloom, does the government believe

1   that it has evidence sufficient to prove the facts you just

2   recited?

3          MS. BLOOM:  Yes, Your Honor.

4          THE COURT:  Rule 11 actually doesn't require that the

5   defendants provide the factual bases or agree to the factual

6   bases themselves, although have to knowingly waive their

7   rights.

8          How do you each wish to plead now to the one count

9   against you; guilty or not guilty?

02:05 10          GABRIEL BITRAN:  Guilty, Your Honor.

11          MARCO BITRAN:  Guilty, Your Honor.

12          THE COURT:  Then I will direct the clerk to enter your

13   pleas of guilty because I find, again, that you are each

14   competent, you are acting knowingly and voluntarily, you are

15   effectively represented, and I also find that there's an

16   independent basis in fact to support your pleas.

17          I'm deferring, I'm going to wait until the sentencing

18   hearing to decide whether to accept the plea agreement and

19   impose the agreed-upon sentence or sentence within the agreed-

02:05 20   upon range, and then if I don't, offer the particular defendant

21   or both of them an opportunity to withdraw their pleas.

22          I expect to be trying the Sampson case Mondays through

23   Thursdays, a capital case, in March.  So I'm looking for a

24   Friday on which to put this.  Do counsel have a conflict on

25   March 6?

1          MS. PEARLSTEIN:  Yes, I do, but I'm free the other

2    Fridays that month.

3          MR. THEODOROU:  Yes, Your Honor.  Same here.

4          THE COURT:  All right.  I'm going to put this on March

5    27, which is a Friday, at 2:30 p.m.

6          If there are any motions, memos, letters, anything not

7    in the Presentence Report that anybody would like me to

8    consider, they shall be filed by March 13 and any responses by

9    March 20.

02:07 10         Did the magistrate judge order the defendants released

11   on certain conditions earlier today?

12         PROBATION:  They did, Your Honor.  The release

13   conditions that Magistrate Collings ordered for Gabriel Bitran

14   was that it was a $25,000 unsecured bond, that he obey all

15   statutory conditions of release, report to the probation and

16   pretrial services office as directed.  Travel is restricted to

17   the Continental United States.  He is to surrender all

18   passports and travel documents to the probation and pretrial

19   services office, and he is not to obtain a passport or any

02:08 20  other travel document while the case is pending.

21         THE COURT:  Okay.  And what about Marco?

22         PROBATION:  They are the same, Your Honor, with the

23   exception that he is allowed to travel to Mexico from January

24   31, 2015 to February 7, 2015 and to surrender his passport on

25   the 9th of February.

        1            THE COURT:  Do you each understand those are the

        2    conditions of your release that the magistrate judge found were

        3    appropriate and that if you violate any of those conditions,

        4    you can be locked up pending trial?

        5            MARCO BITRAN:  Yes, Your Honor.

        6            GABRIEL BITRAN:  I do, Your Honor.

        7            THE COURT:  Okay.

        8            MS. BLOOM:  Your Honor, would it be possible to do the

        9    sentencing on March 13?  That's a Friday as well.

02:09  10            THE COURT:  I think the short answer is no because I

       11    have a conflict with another sentencing that's scheduled.  Is

       12    there a particular problem with the 27th?

       13            MS. BLOOM:  There might be, but I can make it work if

       14    the 13th isn't available.

       15            THE COURT:  At the moment, it's not.  At the moment,

       16    I've got another matter scheduled I think I'd rather not

       17    disrupt.  If it turns out you have a problem, let me know, and

       18    we'll find another day.

       19            MS. BLOOM:  Thank you, Your Honor.

02:10  20            THE COURT:  Is there anything further on this matter

       21    for today?

       22            MR. THEODOROU:  No, Your Honor.

       23            MS. PEARLSTEIN:  No, Your Honor.

       24            (Whereupon the proceedings adjourned at 2:10 p.m.)

       25

1

2                    CERTIFICATE OF OFFICIAL REPORTER

3

4              I, Kelly Mortellite, Realtime Court Reporter, in

5    and for the United States District Court for the District of

6    Massachusetts, do hereby certify that pursuant to Section 753,

7    Title 28, United States Code that the foregoing is a true and

8    correct transcript of the stenographically reported proceedings

9    held in the above-entitled matter and that the transcript page

10   format is in conformance with the regulations of the Judicial

11   Conference of the United States.

12                        Dated this 11th day of March, 2015.

13

14                        /S/ KELLY MORTELLITE

15                        _____

16                        KELLY MORTELLITE, RMR, CRR

17                        OFFICIAL COURT REPORTER

18

19

10:33 20

21

22

23

24

25